UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA           )
                                   )     1:09-CR-144
v.                                 )
                                   )     Collier/Carter
DONALD FILLERS, *et al.*           )

# M E M O R A N D U M

Defendants Donald Fillers and the Watkins Street Project, LLC ("Defendants") are charged

with violations of various federal environmental laws relating to the improper disposal of asbestos.

Defendants moved to suppress asbestos-containing samples obtained from Defendants' lot (and all

consequent "fruit of the poisonous tree") on the ground that the samples were obtained in violation

of the Fourth Amendment (Court File Nos. 84, 77). These motions were referred to United States

Magistrate Judge William B. Mitchell Carter, who held a hearing and subsequently filed a report &

recommendation ("R&R") recommending Defendants' motions be denied (Court File No. 219).

Subsequently, Defendants filed, *inter alia*, a Third Motion to Supplement Suppression Hearing

Evidence (Court File No. 223). Judge Carter filed an R&R that recommended denying this motion,

on the ground that the proposed evidence is irrelevant to the suppression issue (Court File No. 228).

For the following reasons, the Court will **ACCEPT** and **ADOPT** both R&Rs (Court File Nos. 219,

228). Accordingly, Defendants' motions to suppress and to supplement the suppression hearing

evidence will be **DENIED** (Court File Nos. 84, 77, & 223).


I.      **RELEVANT FACTS**

Neither party challenges the Magistrate Judge's account of the testimony and evidence

presented at the hearing, which the Court hereby adopts by reference (Court File No. 219, pp. 2-10).[1] The Court will only briefly summarize the testimony and evidence necessary to this Memorandum.

Defendant Gary Fillers is one of the former owners of Defendant the Watkins Street Project. In 2003, the property previously housing the Standard Coosa Thatcher facility was purchased by Fillers through the Watkins Street Project. Fillers and his associates planned to tear down the old Standard Coosa Thatcher facility, located on the Watkins Street Property, and sell off its parts as salvage. The Watkins Street Property covers approximately one city block. It is bordered by 17th Street on the north, 18th Street on the south, and Watkins Street on the west. A concrete retaining wall runs along 18th Street, separating the Watkins Street Property from the public sidewalk. At the corner of Watkins Street and 18th Street, the wall is approximately five feet nine inches tall. As one walks east from the corner of 18th Street and Watkins Street down the sidewalk along 18th Street, the retaining wall becomes lower and lower until it is only a few inches high and can be easily stepped over. Additionally, at the corner of 18th Street and Watkins Street, ground level on the Watkins Street Property is much higher than the sidewalk; however, as one walks east along 18th Street, ground level on the Watkins Street Property gradually slopes down until the ground on both sides of the (inches high) retaining wall are even.

John Schultz is and has been an investigator with the Hamilton County/Chattanooga Air Pollution Control Bureau ("APCB") for 13 years. On September 8, 2005, Schultz was on routine patrol in Chattanooga when he observed the Watkins Street Property. Standing at the corner of Watkins Street and 18th Street, looking over the concrete retaining wall, Schultz saw what appeared

---

[1]Defendants do have some minor quibbles with the Magistrate Judge's description of some evidence, which the Court will note when relevant.

to be a demolition site with debris scattered across an entire city block. It was obvious to Schultz that buildings had been torn down. Only one building, which appeared to be gutted, still stood on the lot. Schultz determined by looking at surrounding buildings that the demolished buildings on the Watkins Street Property were very old. He knew old buildings typically have asbestos wrap on pipes.[2] There did not appear to be any business whatsoever being conducted on this property.

Debris was everywhere on the Watkins Street Property, piled two to three feet above the retaining wall. Some debris hung off the side of the retaining wall over the public sidewalk, and was even falling onto the sidewalk. Schultz was concerned about pipes hanging over the retaining wall because he recognized that they were wrapped with a material likely to contain asbestos. Some of the pipe wrap had fallen onto the sidewalk. This wrap "sent up a red flag" for Schultz. From his observation point on the corner, Schultz could also see a pipe coming out of the wall of the one remaining structure on the property. That pipe also had wrap on it which Schultz believed likely to contain asbestos. The debris on the property, including pipes, bricks, mangled sheet metal with sharp edges, splintered wood, and pipe wrap, appeared to Schultz to be thrown about in a chaotic, hazardous manner. It appeared obvious to Schultz that no effort had been made to keep people out of the Watkins Street Property. There was no gate, no security guard,[3] no signs indicating this was a demolition site, and no barrier to keep people off of the property. Anyone could easily step onto

---

[2]Another witness, Kathy Jones, testified at the hearing that asbestos materials are still being installed in modern buildings.

[3]An affidavit from Fillers's wife submitted after the suppression hearing indicates David Woods lived near the Watkins Street Property and had a responsibility to keep an "eye" on the property to prevent people from stealing materials. No one, including Defendant Fillers, testified about David Wood at the hearing, and no evidence is before the Court indicating anyone was actively engaging in efforts to keep people off the property.

the property from the east end of 18th Street.[4]  Schultz walked on the Watkins Street Property for

about 15 minutes on September 8, 2005 to investigate.  He did not take any samples at that time.

After making this initial inspection, Schultz contacted Bob Colby and Kathy Jones with the

APCB to inform them that he believed asbestos-containing materials were out in the open at the

Watkins Street Property.  Schultz did not know then who owned the property, but Jones did.  Jones

was and is the manager for the asbestos program for the APCB.  Asbestos must be removed in a

specific manner from buildings, and such removal requires a permit.  Jones informed Schultz that

Defendants had applied for and received an asbestos abatement permit in 2004.

On September 9, 2005, Schultz and Jones met at the Watkins Street Property.  Although they

did not have a search warrant, the two entered the property at the east end of 18th Street, where the

retaining wall is only a few inches tall.  There was no apparent ongoing demolition or other work

occurring on the property that day.  As Jones and Schultz walked around the property, Jones took

three samples of suspected asbestos-containing material.  These samples were lying out in the open,

and Jones did not have to disturb any debris to reach them.  While Jones and Schultz were on the

property, Jones observed a member of the public picking through the rubble on the property.  The

three samples were sent to a laboratory in Georgia where they were tested.  It was determined that

two of the three samples were positive for asbestos-containing materials.

## II.    STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the R&R to which objection

_____

[4]Though, as photographs show, scattered piles of debris would make entrance onto the
property from the east end of 18th street easier at some spots than at others.

is made, 28 U.S.C. § 636(b)(1)(C). But *de novo* review does not require the district court rehear witnesses whose testimony has been evaluated by the Magistrate Judge. *See United States v. Raddatz*, 447 U.S. 667, 675-76 (1980). The Magistrate Judge, as the factfinder, had the opportunity to observe and hear the witnesses and assess their demeanor, putting him in the best position to determine credibility. *Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). The Magistrate Judge's assessment of witnesses' testimony is therefore entitled to deference. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

III.    **DISCUSSION**

Defendants object to each of the legal conclusions made by the Magistrate Judge, to wit: (1) the entrance onto and search of the lot did not violate the Fourth Amendment because (a) Defendants had no subjective expectation of privacy in the lot, and (b) the lot constituted an open field under the open fields doctrine; and (2) the seizure of the asbestos-containing samples did not violate the Fourth Amendment because they were in plain view. The Court will conduct *de novo* review with respect to each of these points.

**A.  Entrance Onto and Search of the Lot**

The Fourth Amendment to the United States Constitution guarantees the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. Crucial to the determination of the "reasonableness" of a search is a consideration of a defendant's privacy interest in the place searched. "It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008)

(quotation omitted); *United States v. Hunyady*, 409 F.3d 297, 300-01 (6th Cir. 2005) ("The capacity to claim the protection of the Fourth Amendment depends upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.") (quotation omitted). Therefore, in order to avail themselves of the protection of the Fourth Amendment with respect to the search of the Watkins Street Property, Defendants must demonstrate they had a legitimate expectation of privacy in the lot.

### 1. Subjective Expectation of Privacy

To demonstrate a legitimate expectation of privacy in the place searched, a defendant must satisfy a two-pronged test: "1) he must manifest an actual, subjective expectation of privacy; and 2) that expectation is one that society is prepared to recognize as legitimate." *Hunyady*, 409 F.3d at 301 (quotation omitted). When considering the first prong, that is, a defendant's manifestation of a subjective expectation of privacy, courts consider a number of factors, including:

> whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he was exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.

*United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000). These factors are not individually dispositive, but rather shed light on the dispositive question of whether a defendant "has shown that he sought to preserve something as private." *Bond v. United States*, 529 U.S. 334, 338 (2000) (quotation omitted); *see Katz v. United States*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.").

Here, the Magistrate Judge determined Defendants did not manifest an actual, subjective expectation of privacy in the lot, and the Court agrees. While it is undisputed Defendants were

lawful possessors of the property and had the *right* to exclude others from the premises, Defendants made absolutely no meaningful efforts to preserve the privacy of the open lot. Evidence from the hearing indicated Defendants posted no signs, erected no fences, and took no others steps to block the public from taking the easy step from the 18th Street sidewalk to the adjacent debris field. No visible business was occurring on the lot on the days in question, nor would a reasonable observer conclude the lot was the locus of ongoing business activity rather than an abandoned urban wasteland. In fact, members of the public could be seen walking through the lot, rummaging through the debris. Although Ms. Fillers's affidavit states David Woods had the responsibility of keeping an "eye" on the property, there is no evidence that Woods or anyone else made any actual efforts to restrict access to the site, or that Woods was anywhere to be found on the dates in question.

Nonetheless, in their objection to the R&R, Defendants contend they did manifest an expectation of privacy by the simple fact that the property was in a state of demolition. "To the defense it seems clear that anyone who contracts to have demolition and salvage work done on his property has exhibited a subjective expectation that his property is private and that anyone not authorized to do demolition or salvage work will stay off of the property." (Court File No. 220, p. 8). Defendants argue the hazardous nature of the site would be immediately apparent to any observer, and thus would effectively shout "Stay Away!" Unfortunately for Defendants, the proposition that a hazardous activity on a piece of property *ex opere operato* manifests the owners' expectation of privacy finds no support in Fourth Amendment law.[5] Indeed, by the same logic, one might argue that a defendant's mere ownership of a piece of property signals to the world that he

---

[5]Cases cited by Defendants regarding landowners' tort liability for open and obvious hazards is inapposite to Fourth Amendment analysis.

seeks to preserve the property as private, since it can hardly be assumed he *wants* others to trespass. While such a world may have much to commend it, it is not the world of our Fourth Amendment jurisprudence. The Fourth Amendment requires the manifestation of an actual, subjective expectation of privacy going beyond the mere supposition that a decent, safety conscious pedestrian will conclude he probably should not enter dangerous property that does not belong to him. The fact that the Watkins Street Property was in an obvious and hazardous state of demolishment did not, without more, manifest an expectation of privacy by Defendants.

Defendants also contend they had a manifest and legitimate expectation of privacy arising from Chattanooga City Ordinance § 4-16, which requires APCB agents to obtain a warrant before conducting a search. This argument, however, "is no less than a suggestion that concepts of privacy under the laws of each State are to determine the reach of the Fourth Amendment," a suggestion the Supreme Court has flatly rejected. *California v. Greenwood*, 486 U.S. 35, 43 (1988); *see also United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir. 1994) ("[T]he appropriate inquiry for a federal court considering a motion to suppress evidence seized by state police officers is whether the arrest, search, or seizure violated the Fourth Amendment. The fact that the arrest, search, or seizure may have violated state law is irrelevant . . . .").

Ultimately, regardless of any subjective expectation buried within Defendants' hearts, no expectation of privacy was made *manifest*, that is, made apparent to any reasonable outside observer. Defendants knowingly exposed the Watkins Street Property and its contents to public view and intrusion. Accordingly, the Magistrate Judge properly concluded the lot was not a subject of Fourth Amendment protection, thus the intrusion thereupon and search by Schultz and Jones did not violate Defendants' Fourth Amendment rights. *See Katz v. United States*, 389 U.S. at 351.

### 2. Open Fields Doctrine

The open fields doctrine is one of the "few specifically established and well-delineated exceptions" to the general rule that "searches conducted . . . without prior approval by judge or magistrate, are *per se* unreasonable." *Katz*, 389 U.S. at 357. Under this doctrine, "the government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment," *Oliver v. United States*, 466 U.S. 170, 177 (1984), regardless of whether the intrusion is a trespass, *Hester v. United States*, 265 U.S. 57, 58 (1924). "Open fields" include:

> any unoccupied or undeveloped area outside of the curtilege. An open field need be neither 'open' nor a 'field' as those terms are used in common speech. For example . . . a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment.

*Oliver*, 466 U.S. at 180 n.11.

The Magistrate Judge determined the Watkins Street Property was an open field, and thus exempt from Fourth Amendment protection. This determination provided a separate, independent basis apart from the "expectation of privacy" basis for concluding Schultz and Jones' intrusion onto the property and ensuing search did not violate the Fourth Amendment. The Court agrees that the Watkins Street Property was an open field. The Fourth Amendment "protects commercial buildings as well as private homes." *Marshall v. Barlows*, 436 U.S. 307, 311 (1978). However, commercial property, like residential property, will lack Fourth Amendment protection if it is an open field. *See McLaughlin v. Elsberry, Inc.*, 868 F.2d 1525, 1530 (11th Cir. 1988) ("the nature of the activity taking place in the open field, be it commercial or otherwise, is insufficient to clothe an open field in fourth amendment protection"). Although the Standard Coosa Thatcher facility was once "developed" and "occupied," on the dates in question it was anything but. The vast majority of the facility had been reduced to heaps of rubble lying on the ground; the one building still standing was

in a partial state of demolition. There was no apparent activity. The lot was the urban equivalent of a razed forest.

Defendants argue that the Watkins Street Property could not be an open field because it was an ongoing commercial enterprise rather than abandoned real estate. Defendants cite their intention to salvage valuable material from the lot, and then sell it for development. However, the open fields doctrine does not require that a piece of property have no live economic function. *See United States ex rel. Saiken v. Bensinger*, 546 F.2d 1292, 1297 (7th Cir. 1976) ("a search of open fields, without a search warrant, even if such fields are construed as part of a commercial enterprise, is not constitutionally 'unreasonable.'"). Indeed, farmland – surely property with an ongoing commercial function – is the paradigmatic "open field." *See, e.g., Oliver*, 466 U.S. at 173; *United States v. Smith*, 966 F.2d 1045, 1048 (6th Cir. 1992). Rather than asking whether or not the Watkins Street Property had an ongoing commercial purpose, the question for purposes of the open fields doctrine is whether it was an "unoccupied or undeveloped area outside of the curtilege." *Oliver*, 466 U.S. at 180 n.11. As discussed above, it plainly was. Accordingly, the Magistrate Judge properly concluded that based on the open fields doctrine, no warrant was required for Schultz and Jones to enter onto and look around the Watkins Street Property.

### B.  Seizure of the Samples – Plain View

As with searches, warrantless seizures are presumptively unreasonable. *Arizona v. Hicks*, 480 U.S. 321, 327 (1987). The plain view doctrine is one well-established exception to this rule. *Id*. at 326 (quotation omitted). This doctrine permits warrantless seizures where: (1) the officer did not violate the Fourth Amendment in arriving at the place from which the item was seen; (2) the item was in plain view; (3) the incriminating character of the item was immediately apparent; and (4) the

officer had a lawful right of access to the object itself.  *See Horton v. California*, 496 U.S. 128, 136-37 (1990).

As a threshold matter, Defendants argue that the plain view seizure doctrine is inapplicable as a matter of law in cases where a search is premised on the open fields doctrine.  However, none of the cases Defendants cites actually supports this proposition.  In *Oliver*, police entered open fields, observed incriminating items, left to obtain a warrants, and then returned to seize the items.  *Oliver* did not consider whether warrants were necessary to effect the seizure, but whether the open fields doctrine applied to permit the officers to enter the fields in the first place.  Similarly in *United States v. Dunn*, 480 U.S. 294 (1987), officers entered an open field, observed a drug laboratory in a barn, and left to obtain a search warrant.  The Court found the officers did not violate the Fourth Amendment in entering the fields and looking in the barn, but did not consider at all whether the plain view doctrine would have permitted the officers to seize the drug laboratory without first obtaining a warrant.  *See also United States v. Rapanos*, 115 F.3d 367 (6th Cir. 1997) (holding the open fields doctrine did not permit government officials to "seize" plant and soil samples to determine if the property at issue was a wetland, but not addressing whether the samples could have been seized if their incriminating character was immediately apparent); *Allinder v. Ohio*, 808 F.2d 1180 (1987) (holding the open field doctrine did not permit government officials to dismantle bee hives to search for signs of disease and take samples, but unsurprisingly not considering the plain view doctrine, since the interior of the hives was not in plain view).

At most, the cases relied upon by Defendants, none of which considered the plain view doctrine, demonstrate the open fields doctrine does not itself authorize seizure of anything that happens to be in the open field.  This is hardly telling, however, as the open fields doctrine is one

concerning *searches*, not *seizures*.  The open fields doctrine, as a doctrine of searches, is silent as to when a seizure may be justified.  Defendants articulate no good reason, and the Court sees none, why an open fields rationale for intruding onto property should commence some special scenario wherein the plain view seizure doctrine cannot apply.  Indeed, the logic of *Horton* seems to demand the doctrine's application: "[w]here the initial intrusion that brings the police within plain view of such an article is supported not by a warrant but by *one of the recognized exceptions to the warrant requirement*, the seizure is also legitimate."  496 U.S. at 135 (emphasis added).  The open fields doctrine is "one of the recognized exceptions to the warrant requirement;" hence, a plain view seizure following an open fields intrusion is legitimate.  Accordingly, the Magistrate Judge properly determined the open fields doctrine does not preclude subsequent application of the plain view doctrine.

The Magistrate Judge further determined the *Horton* factors were met with respect to the three asbestos-containing samples seized by Schultz and Jones.  The Court agrees.  Defendants' primary argument against application of the plain view doctrine is that Schultz and Jones violated the Fourth Amendment in arriving at the place from which they observed in "plain view" the samples in question.  However, as already discussed, Schultz and Jones' entrance onto the Watkins Street Property did not violate the Fourth Amendment, both because Defendants manifested no expectation of privacy in the property, and because of the open fields doctrine.  Given the propriety of their entrance onto the property, it is clear that the first, second, and fourth *Horton* factors are established.[6]

---

[6]It is undisputed that the taken samples were in "plain view" from Schultz and Jones' vantage once they were on the property.

The only remaining issue is whether the incriminating character of the samples was "immediately apparent." Factors "instructive" as to the question of whether the incriminating character of a piece of evidence was immediately apparent include:

> 1) a nexus between the seized object and the items particularized in the search warrant,
> 2) whether the 'intrinsic nature' or appearance of the seized object gives probable cause to believe that it is associated with criminal activity, and
> 3) whether the executing officers can *at the time* of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.

*United States v. McLevain*, 310 F.3d 434, 441 (6th Cir. 2002) (citations omitted). As already discussed, no warrant was necessary to enter the Watkins Street Property, thus the first factor is not relevant to this case. Regarding the second and third factors, the *McLevain* Court stated "we should also note that the Supreme Court does not require that officer *know* that evidence is contraband. Instead, "probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime." *Id.* (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983).

In this case the Magistrate Judge determined Schultz and Jones had probable cause to believe the samples of pipe wrap they collected contained asbestos. This finding was based on the fact that both Schultz and Jones had received relevant training regarding the types of materials in which asbestos are commonly found, both testified they were taught one of the materials most commonly containing asbestos was pipe wrap, and Jones knew (and told Schultz) that the buildings on the Watkins Street Property contained asbestos – hence the need for the asbestos removal permit. Given these factors, the Magistrate Judge concluded, it was reasonable for Jones and Schultz to believe the

samples contained asbestos which, in violation of the law, had not been properly disposed of.

In their objection, Defendants cite hearing testimony to the effect that one cannot "be sure" that an object contains asbestos just by looking at it. This, of course, is a red herring. While uncontroverted testimony from the hearing shows it was not possible to be *certain* the samples seized would contain asbestos, the plain view doctrine does not require certainty, only probable cause. *See McLevain*, 310 F.3d at 441. From the fact that only a lab test can show with certainty that a sample contains asbestos, it does not follow that a trained individual may not be warranted in believing that a sample contains asbestos simply by viewing it.[7] For all the reasons relied upon by the Magistrate Judge, Schultz and Jones were "warrant[ed] . . . in the belief that certain items may be contraband," that is to say, they had probable cause. Accordingly, the Magistrate Judge properly concluded the seizure of the samples was justified by the plain view doctrine, and thus did not violate the Fourth Amendment.

## C. Defendants' Third Motion to Supplement Suppression Hearing Evidence

Following the Magistrate Judge's R&R on the suppression issue, Defendants filed a Third Motion to Supplement Suppression Hearing Evidence (Court File No. 223). Because the Magistrate Judge concluded the proposed evidence is not relevant to the issues presented in the suppression hearing, he recommended the motion be denied. The Court agrees and will deny the motion.

Defendants seek to augment the suppression hearing record with several pieces of evidence, namely: a 2010 e-mail exchange among Kathy Jones at the APCB, officials with the Chattanooga Housing Authority ("CHA"), and Michael Gray, who owns a private asbestos abatement company;

---

[7]Indeed, were laboratory certainty the touchstone of reasonable belief, drugs would not be seizable under the plain view doctrine.

and a report prepared by Special Agent Robin B. Hedden of the U.S. Environmental Protection Agency, dated October 15, 2010. The e-mails concern a project undertaken by the CHA to demolish the Fairmont Building in Chattanooga. The e-mails evidence a disagreement between Jones and the CHA and its concultant, Michael Gray, on whether asbestos abatement was necessary. Jones queried whether the CHA might be using Gray to "lab shop" to obtain better findings regarding asbestos content. Gray unsurprisingly objected to this characterization. It was eventually determined abatement was not necessary, and the Fairmont Building was demolished. The report by Special Agent Hedden summarizes the disagreement, but makes no findings of wrongdoing on anyone's part.

Defendants' argue these e-mails undercut Jones' credibility as a witness by demonstrating "how easily bias can be generated in Ms. Jones." The thread of this argument is difficult to grasp. The e-mails demonstrate a conflict between Jones and the CHA (and consequently, Gray), to be sure, but it is not at all evident that this conflict bespeaks Jones' chronic susceptibility to bias, "need to believe herself vindicated," or "proclivity for making snap judgments" as Defendants assert. By all appearances, Jones and the CHA had a legitimate dispute over which laboratory to use for asbestos testing, involving discussions of lab accreditation, and the like. The report by Special Agent Hadden does not find any wrongdoing by Jones, or even criticize her. It is simply impossible to conjure out of these e-mails any relevant bias or deficient judgment on Jones' part that may have infected her hearing testimony or her determination that the samples collected from the Watkins Street Property were likely to contain asbestos. Accordingly, the Magistrate Judge properly concluded the proposed evidence was irrelevant and the motion to supplement should be denied.

## IV.    CONCLUSION

After reviewing the record, the Court finds the Magistrate Judge properly concluded that neither the search of the Watkins Street Property nor the seizure of the asbestos-containing samples violated Defendants' Fourth Amendment rights.  Additionally, the Magistrate Judge properly concluded the evidence with which Defendants seek to supplement the suppression hearing record is irrelevant to the suppression issue.  Accordingly, the Court will **ACCEPT** and **ADOPT** the R&Rs (Court File Nos. 219, 228).  Defendants' Motions to Suppress and Third Motion to Supplement Suppression Hearing Evidence will be **DENIED** (Court File Nos. 84, 77, 223 ).


_/s/_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**